**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CR-MOORE

Case No. ___14 - 2 0 7 1 2___

18 U.S.C. § 1349
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2
18 U.S.C. § 982(a)(2)
18 U.S.C. § 982(a)(7)

/ McALILEY

FILED by ___ D.C.

SEP 25 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**UNITED STATES OF AMERICA**

**vs.**

**ERNESTO FERNANDEZ,**
**DENNIS HERNANDEZ,**
**JOSE ALVAREZ,**
**JOEL SAN PEDRO,**
**ALINA HERNANDEZ,**
**and**
**JUAN VALDES,**

        **Defendants.**
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were 65 or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320-7b(f).

3.     "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4.     Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and provider number of the physician or other health care provider who ordered the services.

5.     CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs.  CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States.  In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims.  As administrator, Palmetto was to receive, adjudicate, and pay claims submitted by HHA providers under the Part A program for home health claims.

## Part A Coverage and Regulations

### Reimbursements

6.      The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if:

    a.      the patient was confined to the home, also referred to as homebound;

    b.      the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

    c.      the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.      HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care."  The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition.  If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence.  There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8.     In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered.  At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made.  As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm.  Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9.     Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10.     Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS form.

11.     Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any instruction provided to the patient and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

### Special Outlier Provision

12.     Medicare regulations allowed certified HHAs to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified HHA. The certified HHA would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees. However, Medicare regulations prohibit one HHA merely serving as a billing mechanism for another agency.

13.     For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home

health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14.     While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA.  These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

### The Defendants and Related Companies

15.     Professional Medical Home Health LLC ("Professional Home Health") was a Florida limited liability corporation incorporated on or about August 3, 2006, that did business in Miami-Dade County, Florida, as an HHA that purportedly provided home health care services to eligible Medicare beneficiaries.  On or about December 30, 2008, Professional Home Health obtained its Medicare provider number, which authorized Professional Home Health to submit claims to Medicare for HHA-related benefits and services.

16.     Defendant **ERNESTO FERNANDEZ**, a resident of Miami-Dade County, was an administrator of Professional Home Health, and the owner and operator of Ernest Line Consulting Services Inc. ("Ernest Line Consulting"), a corporation organized under the laws of the State of Florida, which purportedly did business at 896 Southwest 144 Avenue, Miami, Florida, 33184.

17.     Defendant **DENNIS HERNANDEZ**, a resident of Miami-Dade County, was the owner and operator of Greden Consulting Inc. ("Greden Consulting"), a corporation organized

under the laws of the State of Florida, which purportedly did business at 11090 Southwest 63 Terrace, Miami, Florida, 33173.

18. Defendant **JOSE ALVAREZ**, a resident of Miami-Dade County, was the owner and operator of Brothers Taylor Rehabilitation Center Inc. ("Brothers Taylor"), a corporation organized under the laws of the State of Florida, which purportedly did business at 5128 Southwest Fourth Street, Miami, Florida, 33134.

19. Defendant **JOEL SAN PEDRO**, a resident of Miami-Dade County, was the owner and operator of Geriatric Treatment Center, Inc. ("Geriatric"), a corporation organized under the laws of the State of Florida, which purportedly did business at 10661 North Kendall Drive, Number 223, Miami, Florida, 33176.

20. Defendant **ALINA HERNANDEZ**, a resident of Palm Beach County, was the owner and operator of Alina's Consultant & Management, Inc. ("Alina's Consultant"), a corporation organized under the laws of the State of Florida, which purportedly did business at 4078 Dale Road, West Palm Beach, Florida, 33406.

21. Defendant **JUAN VALDES**, a resident of Palm Beach County, was the owner and operator of JC Awnings Installation, Inc. ("JC Awnings"), a corporation organized under the laws of the State of Florida, which purportedly did business at 1732 South Congress Avenue, Number 141, Palm Springs, Florida, 33461.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1. Paragraphs 1 through 20 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. From in or around December 2008 through in or around at least February 2014, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

-7-

**ERNESTO FERNANDEZ,**
**DENNIS HERNANDEZ,**
**JOSE ALVAREZ,**
**JOEL SAN PEDRO,**
**and**
**ALINA HERNANDEZ,**

did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.    To knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, 1347; and

b.    To knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.    It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare; (b) concealing of the submission of false and

fraudulent claims to Medicare, the receipt and transfer of the proceeds from the fraud, and the payment and receipt of kickbacks; and (c) causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

**MANNER AND MEANS OF THE CONSPIRACY**

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4.      **ERNESTO FERNANDEZ, DENNIS HERNANDEZ**, and their co-conspirators paid kickbacks to Medicare beneficiaries in return for them agreeing to serve as patients at Professional Home Health.

5.      **ERNESTO FERNANDEZ, DENNIS HERNANDEZ, JOSE ALVAREZ, JOEL SAN PEDRO, ALINA HERNANDEZ,** and their co-conspirators caused patient documentation to be falsified to make it appear that Medicare beneficiaries qualified for and received home health services that were, in fact, not medically necessary and not provided.

6.      **ERNESTO FERNANDEZ, DENNIS HERNANDEZ, JOSE ALVAREZ, JOEL SAN PEDRO, ALINA HERNANDEZ,** and their co-conspirators filed and caused to be filed false and fraudulent claims with Medicare using interstate wire communications, seeking payment for the costs of home health services that were not medically necessary and not provided.

7.      As a result of these false and fraudulent claims, **ERNESTO FERNANDEZ, DENNIS HERNANDEZ, JOSE ALVAREZ, JOEL SAN PEDRO, ALINA HERNANDEZ,** and their co-conspirators caused Medicare to pay approximately $6,200,000 to Professional Home Health.

8.      **ERNESTO FERNANDEZ, DENNIS HERNANDEZ, JOSE ALVAREZ, JOEL SAN PEDRO, ALINA HERNANDEZ,** and their co-conspirators transferred and caused to be

transferred the fraud proceeds to themselves and companies they controlled, and used the proceeds to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

### COUNT 2
**Conspiracy to Defraud the United States and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

1.       Paragraphs 1 through 21 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.       From in or around December 2008, and continuing through in or around at least February 2014, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ERNESTO FERNANDEZ,**
**DENNIS HERNANDEZ,**
**JOSE ALVAREZ,**
**JOEL SAN PEDRO,**
**ALINA HERNANDEZ,**
**and**
**JUAN VALDES,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other and others, known and unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program; and to commit certain offenses against the United States, that is to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and

arranging for the furnishing of an item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

## PURPOSE OF THE CONSPIRACY

3.    It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (1) soliciting and receiving kickbacks and bribes in return  for referring Medicare beneficiaries to Professional Home Health to serve as patients; and (2) submitting and causing the submission of claims to Medicare for home health services that Professional Home Health purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.    **ERNESTO FERNANDEZ, DENNIS HERNANDEZ, JOSE ALVAREZ, JOEL SAN PEDRO, ALINA HERNANDEZ,** and **JUAN VALDES** accepted kickbacks from co-conspirators at Professional Home Health in return for referring Medicare beneficiaries to Professional Home Health for home health services.

5.    **ERNESTO FERNANDEZ, DENNIS HERNANDEZ, JOSE ALVAREZ, JOEL SAN PEDRO, ALINA HERNANDEZ, JUAN VALDES** and their co-conspirators caused Professional Home Health to submit claims to Medicare for home health services purportedly provided to the recruited Medicare beneficiaries.

6.    **ERNESTO FERNANDEZ, DENNIS HERNANDEZ, JOSE ALVAREZ, JOEL SAN PEDRO, ALINA HERNANDEZ, JUAN VALDES** and their co-conspirators caused Medicare to pay Professional Home Health based upon the claims for home health services purportedly provided to the recruited Medicare beneficiaries.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.      On or about July 31, 2013, **ERNESTO FERNANDEZ** deposited check number 4669, drawn on the corporate account of Professional Home Health in the approximate amount of $3,000, into an account held in the name of Ernest Line Consulting, a company he controlled.

2.      On or about September 19, 2013, **ERNESTO FERNANDEZ** deposited check number 4819, drawn on the corporate account of Professional Home Health in the approximate amount of $3,000, into an account held in the name of Ernest Line Consulting, a company he controlled.

3.      On or about April 4, 2011, **DENNIS HERNANDEZ** deposited check number 2682, drawn on the corporate account of Professional Home Health in the approximate amount of $4,800, into an account held in the name of Greden Consulting, a company he controlled.

4.      On or about April 8, 2011, **DENNIS HERNANDEZ** deposited check number 2690, drawn on the corporate account of Professional Home Health in the approximate amount of $4,000, into an account held in the name of Greden Consulting, a company he controlled.

5.      On or about April 19, 2013, **JOSE ALVAREZ** deposited check number 4426, drawn on the corporate account of Professional Home Heath in the approximate amount of $1,900, into an account held in the name of Brothers Taylor, a company he controlled.

6.      On or about May 10, 2013, **JOSE ALVAREZ** cashed check number 4478, drawn on the corporate account of Professional Home Heath in the approximate amount of $1,900.

7.     On or about February 7, 2012, **JOEL SAN PEDRO** deposited check number 3407, drawn on the corporate account of Professional Home Health in the approximate amount of $4,000, into an account held in the name of Geriatric, a company he controlled.

8.     On or about February 10, 2012, **JOEL SAN PEDRO** deposited check number 3441, drawn on the corporate account of Professional Home Health in the approximate amount of $4,000, into an account held in the name of Geriatric, a company he controlled.

9.     On or about January 2, 2012, **ALINA HERNANDEZ** deposited check number 1422, drawn on the corporate account of Professional Home Health in the approximate amount of $2,300, into an account held in the name of Alina Consulting, a company she controlled.

10.     On or about March 13, 2012, **ALINA HERNANDEZ** deposited check number 1486, drawn on the corporate account of Professional Home Health in the approximate amount of $1,900, into an account held in her name.

11.     On or about February 22, 2011, **JUAN VALDES** deposited check number 2570, drawn on the corporate account of Professional Home Health in the approximate amount of $6,600, into an account held in the name of JC Awnings, a company he controlled.

12.     On or about December 27, 2012, **JUAN VALDES** deposited check number 4191, drawn on the corporate account of Professional Home Health in the approximate amount of $3,600, into an account held in the name of JC Awnings, a company he controlled.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 3-14
### Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1.     Paragraphs 1 through 21 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates enumerated below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, as specified below, did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of items and services for which payment may be made in whole and in part under a Federal health care program, that is, Medicare, as set forth below:

| Count | Defendant | Approximate Date | Approximate Amount of Kickback |
|-------|-----------|------------------|-------------------------------|
| 3 | ERNESTO FERNANDEZ | July 31, 2013 | $3,000 |
| 4 | ERNESTO FERNANDEZ | September 19, 2013 | $3,000 |
| 5 | DENNIS HERNANDEZ | April 4, 2011 | $4,800 |
| 6 | DENNIS HERNANDEZ | April 8, 2011 | $4,000 |
| 7 | JOSE ALVAREZ | April 19, 2013 | $1,900 |
| 8 | JOSE ALVAREZ | May 10, 2013 | $1,900 |
| 9 | JOEL SAN PEDRO | February 7, 2012 | $4,000 |
| 10 | JOEL SAN PEDRO | February 10, 2012 | $4,000 |
| 11 | ALINA HERNANDEZ | January 2, 2012 | $2,300 |
| 12 | ALINA HERNANDEZ | March 13, 2012 | $1,900 |

| Count | Defendant | Approximate Date | Approximate Amount of Kickback |
|-------|-----------|------------------|--------------------------------|
| 13 | **JUAN VALDES** | February 22, 2011 | $6,600 |
| 14 | **JUAN VALDES** | December 27, 2012 | $3,600 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

### CRIMINAL FORFEITURE
#### (18 U.S.C. § 982)

1.       The allegations contained in this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants, **ERNESTO FERNANDEZ, DENNIS HERNANDEZ, JOSE ALVAREZ, JOEL SAN PEDRO, ALINA HERNANDEZ,** and **JUAN VALDES** have an interest.

2.       Upon conviction of any violation of Title 18, United States Code, Section 1347 or Title 42, United States Code, Section 1320a-7b(b), or any conspiracy to commit such violations, as alleged in this Indictment, each defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense pursuant to Title 18, United States Code, Section 982(a)(7).

3.       Upon conviction of any violation of Title 18, United States Code, Section 1343, or any conspiracy to commit such violation, as alleged in this Indictment, each defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds obtained directly or indirectly as a result of the offense pursuant to Title 18, United States Code, Section 982(a)(2).

4.     If any of the property described above, as a result of any act or omission of the defendants:

> a. cannot be located upon the exercise of due diligence;
>
> b. has been transferred or sold to, or deposited with, a third party;
>
> c. has been placed beyond the jurisdiction of the court;
>
> d. has been substantially diminished in value; or
>
> e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States of America to seek forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(2), Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853 made applicable by Title 18, United States Code, Section 982(b).

A TRUE BILL

FOREPERSON

WIFREDO A. FERRER
UNITED STATES ATTORNEY

GEJAA GOBENA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ANNE P. MCNAMARA
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

-16-

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

CASE NO. _____

vs.

**CERTIFICATE OF TRIAL ATTORNEY***

ERNESTO FERNANDEZ, et al.,

_____ Defendants.
_____/   **Superseding Case Information:**

**Court Division:** (Select One)

| | | New Defendant(s) | Yes _____ | No _____ |
|---|---|---|---|---|

__X__ Miami _____ Key West          Number of New Defendants _____
_____ FTL _____ WPB _____ FTP     Total number of counts _____

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:     (Yes or No)     __Yes__
   List language and/or dialect     __Spanish__

4. This case will take ____15____ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)

   | I   | 0 to 5 days     | _____ | Petty   | _____ |
   |-----|-----------------|--------|---------|--------|
   | II  | 6 to 10 days    |        | Minor   | _____ |
   | II  | 11 to 20 days   | __X__  | Misdem. | _____ |
   | IV  | 21 to 60 days   | _____ | Felony  | __X__  |
   | V:  | 61 days and over| _____ |         |        |

6. Has this case been previously filed in this District Court?     (Yes or No)     __No__
   If yes:
   Judge: _____     Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?     (Yes or No)     __No__
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____ District of _____

   Is this a potential death penalty case? (Yes or No)     __No__

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?     _____ Yes     __X__ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?     _____ Yes     __X__ No

_____
ANNE P. McNAMARA
DOJ TRIAL ATTORNEY
Court No. A5501847

*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   ERNESTO FERNANDEZ

**Case No:**

Count #:  1

 18 U.S.C. § 1349

 Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:   Twenty (20) years' imprisonment

Count #:  2

 18 U.S.C. § 371

 Conspiracy to Defraud the United States and Receive Health Care Kickbacks

**\*Max Penalty**:    Five (5) years' imprisonment

Counts #: 3 – 4

 42 U.S.C. § 1320a-7b(b)(1)(A)

 Receipt of Kickbacks in Connection With a Federal Health Care Program

\*Max Penalty:    Five (5) years' imprisonment as to each count

Count #:

\*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**    DENNIS HERNANDEZ

**Case No:**

Count #:  1

 18 U.S.C. § 1349

 Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:   Twenty (20) years' imprisonment

Count #:  2

 18 U.S.C. § 371

 Conspiracy to Defraud the United States and Receive Health Care Kickbacks

**\*Max Penalty**:    Five (5) years' imprisonment

Counts #: 5 – 6

 42 U.S.C. § 1320a-7b(b)(1)(A)

 Receipt of Kickbacks in Connection With a Federal Health Care Program

\*Max Penalty:    Five (5) years' imprisonment as to each count

Count #:




\*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   JOSE ALVAREZ

**Case No:** _____

Count #:   1

 18 U.S.C. § 1349

 Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:   Twenty (20) years' imprisonment

Count #:   2

 18 U.S.C. § 371

 Conspiracy to Defraud the United States and Receive Health Care Kickbacks

**\*Max Penalty**:    Five (5) years' imprisonment

Counts #: 7 – 8

 42 U.S.C. § 1320a-7b(b)(1)(A)

 Receipt of Kickbacks in Connection With a Federal Health Care Program

\*Max Penalty:    Five (5) years' imprisonment as to each count

Count #:

_____

_____

\*Max Penalty: _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   JOEL SAN PEDRO

**Case No:**

Count #:  1

 18 U.S.C. § 1349

 Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:  Twenty (20) years' imprisonment

Count #:  2

 18 U.S.C. § 371

 Conspiracy to Defraud the United States and Receive Health Care Kickbacks

**\*Max Penalty**:   Five (5) years' imprisonment

Counts #: 9 – 10

 42 U.S.C. § 1320a-7b(b)(1)(A)

 Receipt of Kickbacks in Connection With A Federal Health Care Program

\*Max Penalty:   Five (5) years' imprisonment as to each count

Count #:

\*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant□s Name:**   __ALINA HERNANDEZ__

**Case No:** _____

Count #:   1

 18 U.S.C. § 1349

 Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:   Twenty (20) years' imprisonment

Count #:   2

 18 U.S.C. § 371

 Conspiracy to Defraud the United States and Receive Health Care Kickbacks

**\*Max Penalty**:   Five (5) years' imprisonment

Counts #: 11 – 12

 42 U.S.C. § 1320a-7b(b)(1)(A)

 Receipt of Kickbacks in Connection With a Federal Health Care Program

\*Max Penalty:   Five (5) years' imprisonment as to each count

Count #:

_____

_____

\*Max Penalty: _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant☐s Name:**    JUAN VALDES

**Case No:**

Count #:  2

 18 U.S.C. § 371

 Conspiracy to Defraud the United States and Receive Health Care Kickbacks

**\*Max Penalty**:    Five (5) years' imprisonment

Counts #: 13 – 14

 42 U.S.C. § 1320a-7b(b)(1)(A)

 Receipt of Kickbacks in Connection With a Federal Health Care Program

\*Max Penalty:    Five (5) years' imprisonment as to each count

Count #:


\*Max Penalty:
Count #:


\*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**